IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2012 Session

## STATE OF TENNESSEE v. BILLY JOE CARTER

**Direct Appeal from the Circuit Court for Cocke County**
**No. 1072    Ben W. Hooper, II, Judge**

_____

**No. E2012-00279-CCA-R3-PC - Filed February 20, 2013**

_____

A Cocke County jury convicted the Petitioner, Billy Joe Carter, of first degree murder, first degree felony murder, and especially aggravated robbery. The jury sentenced him to life in the Department of Correction without the possibility of parole for the two first degree murder convictions, and the trial court sentenced him to 40 years in the Department of Correction as a Range II, multiple offender for the especially aggravated robbery conviction. On direct appeal, this Court ordered the trial court to merge the two first degree murder convictions, and we affirmed the Petitioner's convictions in all other respects. *State v. Billy Joe Carter*, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010 (Tenn. Crim. App. May 24, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007). The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel because his trial counsel failed to request a pre-trial mental evaluation of him. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's dismissal of his petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

J. Derreck Whitson, Newport, Tennessee for the appellant, Billie Joe Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; James B. Dunn, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the murder of the victim, Clyde Reed. On direct appeal, this Court summarized the testimony at trial as follows:

The proof at trial showed that on November 10, 2003, at approximately 12:30 or 1:00 a.m., the [Petitioner] and the victim, Clyde Reed, entered William Stuart's house at 450 Old Sevierville Highway in Cocke County to visit with Mr. Stuart's father. Mr. Stuart testified that he was in bed when he heard the men enter and leave. Shortly after the [Petitioner] and the victim left the house, Mr. Stuart's father asked Mr. Stuart to jump-start the victim's car. Mr. Stuart complied, helping the victim roll the victim's car out of the Stuart driveway to the side of Old Sevierville Highway, so he could pull his truck beside the victim's car to use the jumper cables. Mr. Stuart testified that the attempts failed; thus, he drove his truck back into his driveway and re-entered his house.

Approximately five minutes later, Mr. Stuart's father left the house and yelled for the victim. After hearing no answer from the victim, Mr. Stuart walked outside and found the victim lying on the ground. He then called 9-1-1.

On cross-examination, Mr. Stuart testified that the [Petitioner] was in the victim's car while he and the victim tried to start the victim's car. Mr. Stuart neither spoke to the [Petitioner] nor saw the [Petitioner] remove a torque wrench from his father's truck. In addition, Mr. Stuart testified that his father's radio scanner was missing after the [Petitioner] and the victim left the house, and he identified the missing scanner in court.

Cocke County Deputy Sheriff Eric Rinehart testified that on November 10, 2003, he received a report of a man in the roadway on Old Sevierville Highway near the Stuart residence. When he arrived on the scene, he met Josh Shehee, who related to Deputy Rinehart what he had seen. Deputy Rinehart performed chest compressions on the victim when he arrived at the scene until Emergency Medical Services personnel relieved him.

Deputy Rinehart testified that the victim's face was covered in blood and that he had a "huge hole in his skull." He also observed that the victim's blue jeans were partially pulled down, but he denied moving the victim's body while administering the chest compressions.

Cocke County Deputy Sheriff Kevin Benton testified that on November

-2-

10, 2003, he received a report of two individuals fighting on Old Sev[i]erville Highway. Deputy Benton learned that one person remained at the scene, and the other subject left the scene on foot. Thus, he received an order from his sergeant, Richard Caldwell, to patrol the surrounding area to look for the subject, who was described as being bald or having short hair and wearing a black leather jacket.

Approximately one and one-half miles from the scene, Deputy Benton saw the [Petitioner], who met the description, carried a metal object in one hand and a liquor bottle in the other, and was covered in blood. The [Petitioner] was walking towards Highway 411. Deputy Benton testified that the [Petitioner] had blood splatters on his face, pants, shoes, and hands.

Deputy Benton radioed the dispatcher that he spotted the [Petitioner] before ordering the [Petitioner] to put up his hands. The [Petitioner] dropped the items in his hands, walked approximately one car length, and raised his hands. Deputy Benton instructed the [Petitioner] to lie on the ground, and after back-up officers arrived, they handcuffed the [Petitioner].

When Deputy Benton searched the [Petitioner], he found a Maglite flashlight, scanner, wallet, toothpick holder, comb, key ring, piece of paper containing a telephone number, toilet bowl freshener, Snuggle dryer sheets, cigarettes, two bandanas, two watches, two knives, two used hypodermic needles, and two unused hypodermic needles. He testified that the wallet contained cards, telephone numbers, and receipts that bore the victim's name. In addition, Deputy Benton testified that he found the items that the [Petitioner] dropped, a Traveler's Club liquor bottle and a blood-stained torque wrench.

On cross-examination, Deputy Benton testified that, except for the torque wrench, the items he found were not splattered with blood, and to his knowledge, no one dusted the scanner for fingerprints.

Ricky Reed, the victim's brother, testified that the victim suffered from heart failure and constantly required oxygen from a tank he carried with him. Mr. Reed last saw his brother on November 9, 2003, and he testified that November 10 was the victim's birthday. Mr. Reed testified that on November 9, the victim had on his person $100 to send to their sister and at least two other $20 bills. Mr. Reed also stated that the victim wore a silver and gold round-faced watch and carried a "brownish-looking" Case knife, which the

victim had used on November 9 while repairing automobile speakers. At trial, items found on the [Petitioner] shortly after the murder were entered into evidence. From these items, Mr. Reed identified a watch, knife, and wallet as having belonged to the victim.

On cross-examination, Mr. Reed testified that he received the victim's car approximately one week after the murder. He stated that he had to jump-start the car, that he had not previously noticed damage to the right fender and right door, and that the victim's oxygen tank was not in the car. Mr. Reed had seen the victim get into fights before, but he explained that because of his poor health, the victim was no longer able to fight. Furthermore, he admitted that the victim had been going to a methadone clinic for treatment. Mr. Reed also admitted that he himself was convicted of burglary in Hamblen County in 1981.

Cocke County Sheriff's Department Sergeant Richard Caldwell testified that he was en route to the scene when he learned that the [Petitioner] had been taken into custody. Upon arriving at the place of the [Petitioner]'s arrest, Sergeant Caldwell collected all evidence found on the [Petitioner], including the flashlight, scanner, and torque wrench. He then took the evidence to Cocke County Sheriff's Department Detective Derrick Woods.

On cross-examination, Sergeant Caldwell testified that he neither searched the victim's car nor secured evidence from the murder scene. While at the murder scene, he did not observe an oxygen tank.

Detective Woods testified that he investigated the murder scene, searching for evidence and diagraming the area. He testified to the position of the body in relation to the victim's car and the Stuart house. He also testified that he found several of the victim's teeth at various locations at the scene.

Detective Woods described the [Petitioner] as being "extremely covered in blood," and he identified the clothing the [Petitioner] wore the night of the murder, which Detective Woods collected and took to Tennessee Bureau of Investigation ("TBI") Agent Derrick Newport for processing. Detective Woods also testified that he observed blood not only on the clothing but also on the [Petitioner]'s hands and face. Detective Woods testified that he did not observe any wounds on the [Petitioner] and that the [Petitioner] never complained to him of being hurt.

At the sheriff's department, the [Petitioner]'s fingerprints were taken in Detective Woods's presence. Detective Woods also attended the autopsy of the victim's body, and he was present when two vials of blood were drawn. He testified that he turned over all evidence to TBI Agent Newport.

On cross-examination, Detective Woods testified that he did not collect the victim's clothing for examination. He identified the liquor bottle, scanner, bandanas, syringes, two purple and green caplets, four Neurontin pills, two nickels, and five pennies as items he took from the [Petitioner] on November 10. FN1 Detective Woods did not see any blood on the wallet and stated that had he seen blood on any of the items, he would have noted it. He also identified several bottles of prescription medications and a cellophane wrapper containing assorted pills found in the victim's car. All prescription bottles bore the victim's name, and he did not send any of the medications to the TBI laboratory for analysis. Finally, he testified that when he photographed the [Petitioner] and collected his clothing at approximately 7:00 a.m. on November 10, the [Petitioner] was coherent and not under the influence of alcohol or drugs.

FN1. The caplets, Neurontin pills, nickels, and pennies were not mentioned by Deputy Benton but were contained in the exhibited trial photographs.

Doctor Darinka Mileusnic-Polchan testified that she performed the autopsy on the victim's body on November 11, 2003. Doctor Mileusnic-Polchan testified that the victim's body was covered in blood and that she found 22 injuries to the head, which was the most severely injured area. She testified that the victim's face was "caved in" due to the bones' fractures. Doctor Mileusnic-Polchan testified to two large lacerations on the victim's forehead, and she stated that because of the nature of the injuries, she could determine that they were inflicted by a "pretty solid, compact object [that] was relatively long and narrow." She testified that the victim's brain tissue was visible through one of these skull fractures and that the victim bled under the skull into the soft tissue and hemorrhaged at the top of the brain. Doctor Mileusnic-Polchan explained further injuries to the victim's nose, lips, and chin area, including tears, lacerations, and bruises. She explained that because of these extensive injuries, "[the victim] was grossly deformed."

Doctor Mileusnic-Polchan testified that the victim aspirated much blood and even aspirated a portion of his dentures, which was found in one of the

lungs. In addition, the victim suffered wounds to his hands, located on the external portion of the hand. Doctor Mileusnic-Polchan described defensive injuries to the victim's hands. She also explained "train track" injuries to the victim's stomach and concluded that these were caused by a solid, narrow elongated object. Doctor Mileusnic-Polchan further testified that the head and stomach injuries were caused by an object consistent with a torque wrench. She also testified that the victim suffered a fracture of the hyoid bone, commonly referred to as the Adam's Apple, which she opined was caused by stomping, consistent with the [Petitioner]'s tennis shoes. Finally, Dr. Mileusnic-Polchan stated that the cause of death was cranial cerebral injuries due to blunt head trauma caused by assault.

On cross-examination, Dr. Mileusnic-Polchan testified that some of the cuts and bruises on the victim's hands could have occurred during a fist fight; however, she opined that they were defensive wounds, not aggressive wounds. She also testified that there were several abrasions, scratches, and cuts on the victim's gluteal region, but she could not identify their cause. Doctor Mileusnic-Polchan also testified that she could not determine if a fist fight ever occurred, but she could determine that the end result was a beating with a weapon.

She testified that as with all homicide cases, she drew the victim's blood to be analyzed by the TBI. The blood contained ethyl or ethanol alcohol well above the legal limit, methadone within the therapeutic range, and cocaethylene, a substance formed when alcohol and the end products of cocaine are present in the blood. Doctor Mileusnic-Polchan testified that the victim's urine contained alcohol and ecgonine methyl ester, which is another breakdown of cocaine. She also testified that the victim had a healing needle mark on his arm. She said, "The track mark is evidence of previous injections of some sort in the area of the antecubital fossa, possibly intravenous drug abuse." Doctor Mileusnic-Polchan further testified that she found no new needle marks.

TBI Agent and Forensic Scientist Bradley Everett testified that he took deoxyribonucleic acid ("DNA") profiles from the [Petitioner]'s and the victim's blood samples. He then examined the blood found on the [Petitioner]'s clothing, and he determined that the blood found on the [Petitioner]'s jeans, undershirt, black tee-shirt, leather jacket, and shoes matched the victim's. Agent Everett also testified that the blood found on the torque wrench and flashlight matched the victim's. Moreover, none of the

blood tested matched the [Petitioner]'s.

Agent Everett testified on cross-examination that he caused neither the tear on the backside of the leather jacket nor the tear on the left knee area of the blue jeans. He stated that he did not test every spot of blood found on the clothing or the torque wrench and flashlight.

TBI Agent and Forensic Scientist David Hoover, with the Latent Prints Unit, testified that he examined the Maglite flashlight for fingerprints. He was unable to find the victim's or the [Petitioner]'s prints on the flashlight, and he emphasized that this was not unusual. Agent Hoover further testified that he was unable to find the victim's prints on the torque wrench, but he did find the [Petitioner]'s right middle fingerprint on the wrench.

On cross-examination, Agent Hoover testified that the metals tested were not the best surfaces for retrieving latent prints. He testified that he could not tell the jury who held the flashlight or whether someone other than the [Petitioner] held the torque wrench.

Joshua Shehee testified that on November 10, 2003, he was driving on Old Sevierville Highway when he saw the [Petitioner] standing over another man in the middle of the road. At first, Mr. Shehee thought that the two men were drunk and that the [Petitioner] was trying to help the victim out of the roadway. However, he then saw the [Petitioner] beating the victim with a "pipe," which he stated looked like the torque wrench in evidence at trial. Mr. Shehee testified that the [Petitioner] was holding the victim by his shirt and beating him in the head, and he asked the [Petitioner] to stop. At one point, the [Petitioner] did stop beating the victim long enough to ask Mr. Shehee for a ride, but when Mr. Shehee refused, the [Petitioner] resumed beating the victim. Thus, Mr. Shehee drove to a convenience store to call the police. He testified that the victim was still breathing when he drove away.

After calling the police, Mr. Shehee returned to the murder scene, and he observed that the victim had been pulled off the roadway and that his pants were partially pulled down. The [Petitioner] was not at the scene. Mr. Shehee stayed at the scene until the police arrived.

Mr. Shehee testified on cross-examination that on the 9-1-1 tape he did say that someone was beating the victim with a "stick." He testified at trial that the object was silver. Mr. Shehee admitted that he described the

[Petitioner] as wearing a red shirt, but he admitted that he might have been mistaken regarding the color, possibly due to the amount of blood on it. He testified that he had previously known the victim and knew that he was not healthy. Mr. Shehee testified that he did not see the victim fight and doubted that he could because "[h]e couldn't hardly breathe." He also admitted that he identified the [Petitioner] at the murder scene as the [Petitioner] sat passed out alone in the patrol car. Mr. Shehee was not shown a photographic array for identification purposes.

The [Petitioner] testified on his own behalf that he met the victim in the Hamblen County Jail and had known the victim for 15 to 16 years. He testified that almost every time that he associated with the victim they were "drinking or doing dope." On November 9, 2003, the [Petitioner] attempted to contact the victim a couple of times, and the victim called him back at approximately 9:30 p.m. The [Petitioner] and the victim met, and the two rode around in the victim's "little bitty . . . red car." The [Petitioner] testified that they drank liquor, and he "chas[ed] [the liquor] with the beer that [he] had." The [Petitioner] also testified that he took three or four "blue Valiums, and two or three 10-milligram hydrocodones" that the victim gave him.

At some point, the two decided to drive to the Stuart house to get "dope." Approximately two to four miles from the house, the victim drove the car into a ditch and over a rock. The [Petitioner] testified that the wreck "tore up the front end of the car" and "knocked the battery loose." The car would not restart, so to avoid another driving under the influence charge for the victim, the two men walked into the nearby woods. The [Petitioner] testified that while walking into the woods, the victim asked him to retrieve his belongings from the car's glove compartment. Thus, he retrieved the victim's wallet, a white piece of paper, and a "bag full of medicine." Once in the woods, they continued to drink liquor and smoke cigarettes that the [Petitioner]'s uncle had bought for him.

The [Petitioner] testified that because the police did not come, they returned to the car and adjusted the battery. The car started, and they drove to the Stuart house. At the house, they visited with William Stuart's father. The [Petitioner] testified that the victim instructed him to go to the bathroom because "old man" Stuart FN2 would not give the victim drugs in the [Petitioner]'s presence; thus, the [Petitioner] went to the restroom.

FN2. The [Petitioner] never referred to Mr. Stuart's father by his name; he

-8-

referred to him as "old man."

After returning from the restroom, the [Petitioner] injected himself with what he thought was liquid morphine. The [Petitioner] stated that they continued to drink and talk. At some point, the victim passed out, but the [Petitioner] continued to drink and smoke. He then asked the "old man" to take him home, but the [Petitioner] learned that the elder Mr. Stuart could not drive at night. The [Petitioner] again tried to wake the victim, but the victim demanded that the [Petitioner] leave him alone. The [Petitioner] explained that in the past when the victim would drink and ingest drugs, he would become angry and fight.

After his attempts to wake the victim were unsuccessful, the [Petitioner] continued to drink and smoke from the house's porch. The victim then came onto the porch and told the [Petitioner] that he would take him home. The [Petitioner] testified that the victim was angry because "old man" Stuart had awoken him. The [Petitioner] sat in the passenger's side of the victim's vehicle while the victim and William Stuart moved the car and attempted to jump-start the car. However, the car would not start, and Mr. Stuart re-entered the house.

The [Petitioner] testified that he could hear the victim cursing, and at one point, the victim told the [Petitioner] to "get [his] sorry ass out of the car and help him fix his car." The [Petitioner] complied and held a flashlight while the victim "beat on the battery cables" with the torque wrench. The victim blamed the [Petitioner] for the car problems, and an ensuing argument led to a fight. The [Petitioner] stated that the two men fought in front of the car, in the roadway, and on the ground in some rocks. He testified that he kicked and hit the victim although he could not remember how many times.

The [Petitioner] further testified that he became short of breath and felt like he was going to vomit due to the alcohol, so he sat in the car's passenger seat with the door open. He heard the victim say, "I'm going to bust your f---ing head," and the victim swung the torque wrench hitting the top of the passenger-side door and striking the [Petitioner] on his shoulder. The two men fought again, and the [Petitioner] gained control of the wrench. The [Petitioner] then hit the victim with the wrench, but he could not recall how many times. He also testified that he felt scared when the victim came at him with the wrench.

-9-

The [Petitioner] only remembered one of the Stuarts "coming down" during the fight. After the fight, the [Petitioner] walked down the road. He testified that he had injured his eye, mouth, ribs, and shoulder and had scratches on his face. He also testified that he tore his blue jeans during the fight. The [Petitioner] testified that a few days after the fight, while in police custody, the police put someone else in the "drunk tank" with him, and this person said that the [Petitioner] had a black eye and bruises on his back.

When asked to identify property found on his person when arrested, the [Petitioner] testified that he got the leather jacket from his uncle, and he did not notice the tear in the back when he received it. He stated that the jacket pockets contained the "fabric softener sheets, the salt shaker thing, [and the] bandanas." The [Petitioner] also explained that he and the victim decided to steal the two watches and the scanner from a table in the Stuart house. They planned on taking the items to Newport and selling them.

The [Petitioner] testified that he felt the effects of the Valium, morphine, and alcohol the entire next day. He emphasized that he was still under the influence when the officers questioned him on the morning of November 10. Lastly, the [Petitioner] admitted to being convicted of aggravated burglary in 1995 and three misdemeanor thefts in 1994 and 1995.

On cross-examination, the [Petitioner] testified that he had just been released from a State penitentiary 11 to 12 hours prior to the murder. He first went to his uncle's house, and his uncle bought him cigarettes and gave him money to buy beer. The [Petitioner] testified that he did not have any money and that he received the morphine from "old man" Stuart on credit. The [Petitioner] explained that he planned to go to the doctor and get "Valiums, hydrocodone, [and] Somas" to sell and pay "old man" Stuart back. He explained that he had received $700 worth of pills from one doctor in the past.

The [Petitioner] testified that he was unaware of the victim's health problems and his need for oxygen.

Regarding the murder, the [Petitioner] testified that at some point, the victim possessed the torque wrench and swung it at him once. Once he took it from the victim, the victim had nothing in his hands. The [Petitioner] testified that he did not know whether he hit the victim with the wrench more than once despite hearing Dr. Mileusnic-Polchan's testimony regarding the victim's 22 head injuries. The [Petitioner] also testified that he did not think

-10-

the marks on the victim's stomach came from the wrench, and he did not recall how many times he kicked the victim while they were fighting. He also neither recalled anyone requesting him to stop beating the victim nor asking someone for a ride.

The [Petitioner] also testified that he told an officer that evening that he hit the victim in the face with his fist and that he never mentioned hitting the victim with the wrench. He stated that he did not remember the entire conversation because he was so drunk. He further admitted that he lied to the officer that night when he said the victim charged him with a tire iron. The [Petitioner] testified that when he was talking to the officers at the time of his arrest, he was unaware of the victim's death; however, he admitted that he told one officer, "I think I've killed somebody today." He further denied saying, "Clyde Reed's a piece of sh-."

The [Petitioner] testified that he and the victim stole the watches and the scanner from the Stuart house, but he denied taking the victim's knife from the victim. The [Petitioner] admitted that he had two knives on his person which belonged to him. He also denied taking the victim's wallet from the victim; he claimed that he retrieved it from the car's glove box at the victim's request.

Finally, the [Petitioner] testified that he received injuries during the fight, and he emphasized that he did not intend to kill the victim.

Frank Jenkins, Jr., testified on the [Petitioner]'s behalf that he had known the victim for approximately 30 years. They drank together on several occasions, and he stated that the victim liked to fight when he got drunk. He stated that the victim would act like "he was mad at the world."

Mr. Jenkins testified on cross-examination that because the victim was in poor health, he would pick up things with which to fight. He stated that the last time he saw the victim get into a fight was in the 1980s.

In rebuttal, Cocke County Sheriff's Department Chief Detective Robert Caldwell testified that he arrived on the murder scene at approximately 3:35 a.m. on November 10. He did not speak with the [Petitioner] at that time but spoke with him around 7:25 a.m. after escorting him from jail to his office. There, he and TBI Agent Newport advised the [Petitioner] of his rights, and after the [Petitioner] waived his rights, the [Petitioner] gave a statement.

Detective Caldwell did not observe any wounds on the [Petitioner], and he stated that the [Petitioner] was coherent, responded "intelligently" to questions, and was not under any chemical influence. The [Petitioner] neither claimed that the victim hit him nor injured him. The [Petitioner] mentioned neither the watches, hitting the victim with the torque wrench, nor drinking so much that he did not remember what happened. The [Petitioner] also stated that the victim's wallet was lying on the ground.

On cross-examination, Detective Caldwell stated that the [Petitioner] was not drunk during questioning, but he did not test the [Petitioner]'s blood alcohol level with the Sheriff's Department's Intoximeter. He testified that during questioning the [Petitioner] appeared to have less blood on his face than when he was at the murder scene. Detective Caldwell also testified that he saw the tear in the [Petitioner]'s pants, but he did not check to see if the [Petitioner]'s knee was injured.

Steve Blanchett, a newspaper reporter, testified that on November 10, he photographed the [Petitioner] in court. He personally observed the [Petitioner] and did not see any scratches or bruises on the [Petitioner]'s face. On cross-examination, however, he testified that he saw some red marks on the [Petitioner]'s face on November 10 and that the [Petitioner] had discoloration at trial.

Cocke County Deputy Sheriff Ronald Hall testified that he helped arrest the [Petitioner] on November 10 along with Deputy Denton and Tennessee State Trooper Kevin Kimbro. He testified that Trooper Kimbro's patrol car's video camera recorded the arrest.

On cross-examination, Deputy Hall testified that he gave the [Petitioner] the Miranda warning, and the [Petitioner] responded, "I haven't been out of prison a day and already killed a man." Deputy Hall did not remember the [Petitioner] saying, "Not guilty." He did admit that at that time, the [Petitioner] appeared to be under the influence; however, on redirect examination, Deputy Hall testified that the [Petitioner] appeared to understand his rights when they were given.

Trooper Kimbro testified that he assisted Cocke County deputies on November 10 in the arrest of the [Petitioner]. He identified the videotape which was recorded by his patrol car's video camera. Trooper Kimbro testified that the tape showed Deputy Hall reading the [Petitioner] his rights.

Trooper Kimbro testified that the [Petitioner] stated that he had killed someone that day and that he stated the victim "was a piece of sh-." Both statements were audible on the videotape, according to Trooper Kimbro's testimony.

Trooper Kimbro testified on cross-examination that he instructed the [Petitioner] to speak up when the [Petitioner] stated that he understood his rights. He admitted that the [Petitioner] was under the influence at that time. He further testified that the [Petitioner] said, "Not guilty," but he did not remember anyone saying, "There's a dead man down the road."

*Carter*, 2007 WL 1515010 at * 1-9.

After hearing this evidence, the jury convicted the Petitioner of first degree premeditated murder, first degree felony murder, and especially aggravated robbery.

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. The post-conviction court held a hearing, during which the parties presented the following evidence: The Petitioner testified that he was raised by his uncle and grandmother because his father was an alcoholic and his mother died when the Petitioner was six years old. He said that he began drinking at the age of five or six, right before the death of his mother. The Petitioner began sniffing glue at the age of eight and continued to do so until he was fifteen or sixteen years old. The Petitioner recalled that he was sent to "reform school" nine times for sniffing glue and failing to attend school.

The Petitioner testified that he had a history of mental health treatment beginning at the age of ten. At the age of fourteen or fifteen, the Petitioner began "shooting dope," such as Valium, Percodan, and Percocet. He later used morphine, cocaine, and heroin. The Petitioner described for the post-conviction court how he would break up the pills and place them in water and then "draw[ ] it up through a piece of pipe." He later learned how to cook the drugs in order to take them intravenously.

The Petitioner testified that he was arrested for robbery at the age of fifteen and tried as an adult. He served time in the Morgan County jail for that offense and was released for three months before being arrested for forgery and possession of drugs. The Petitioner said that, including a parole violation, he served four or five years in jail for these crimes. The Petitioner was again released on parole and immediately began using drugs and alcohol. Twenty-three days after his release he was arrested for aggravated burglary. After being convicted for this offense, and serving some time, the Petitioner was released on parole again

and, forty days later, he was arrested for driving under the influence, shop-lifting, and "something else." The Petitioner violated his parole with these new arrests, and he returned to prison. The next time he was released from prison, he remained out for approximately two weeks before he was arrested for aggravated assault and sentenced to serve six years which included a parole violation. The Petitioner said that he continued to take morphine intravenously while he was in prison. The Petitioner recalled that his last release from prison was on Sunday, November 9, 2003.

The Petitioner testified that he called his uncle to come and pick him up when he was released on November 9, 2003. He recalled that he requested that his uncle "[b]ring [him] some pills," and his uncle brought Valium and Lortab. The Petitioner consumed approximately twenty Valium and fourteen or fifteen Lortab on the drive from prison to his uncle's house. That night, the Petitioner and the victim "[w]ent out drinking and eating pills." The Petitioner said that he was drinking from a liter bottle of Travelers Club Liquor and swallowing Valium and Lortab pills. He could not recall how many of the pills he ingested but estimated seven or eight of each type of pill.

The Petitioner testified that he and the victim went to "old man St[u]art's house" and continued drinking. At Stuart's house, the Petitioner said that he injected what he believed was liquid morphine. He stated, "I was so messed up. I don't know if it was [liquid morphine] or not." Additionally, he drank whiskey.

When the Petitioner was first arrested for the victim's murder, he was housed in the "drunk tank" in Cocke County before being moved three or four days later to Sevierville. He remained in Sevierville for twenty-one days before he was transported to Riverbend Correctional Facility in Nashville, Tennessee. He remained in the Nashville facility for two years. The Petitioner said that, during this time, his attorney ("Counsel") never came to Riverbend to meet with him. The Petitioner said that Counsel did meet with him while he was housed in Sevierville. Counsel would also talk with the Petitioner at court appointments. The night before trial, Counsel spent thirty-five or forty minutes with the Petitioner in "the old jail."

The Petitioner testified that, during one of his meetings with Counsel at the Sevierville facility, the Petitioner told Counsel that he had been treated at Cherokee Mental Health and received disability checks as a result of his diagnosis for drug and alcohol addiction. The Petitioner said that he told Counsel that he wanted a mental evaluation, but he did not recall Counsel's response to this request. The Petitioner said, however, that a mental evaluation was never administered. The Petitioner said that he would still like to be evaluated if that service was made available to him.

-14-

On cross-examination, the Petitioner testified that he only requested a mental evaluation one time and maintained that he did not recall Counsel's response to this request. Upon further questioning by the post-conviction court, the Petitioner affirmed that he had reported to Cherokee Mental Health in 1990 that he drank "two or three fifths of liquor a day and a case of beer." The Petitioner also confirmed that, at that time, he would smoke "ten joints of marijuana."

Counsel testified that he was appointed to represent the Petitioner in the case involving the death of the victim. Counsel recalled that the Petitioner was first taken to the Cocke County jail and then transferred to Sevier County briefly before he was again moved to the Blount County Detention Facility. Counsel said that it was at this facility where he had several conferences with the Petitioner to review the evidence. Once the Petitioner was transported to Riverbend, Counsel was unable to meet with the Petitioner in person but said that he and the Petitioner communicated "quite extensively by letters." Counsel said that he also met with the Petitioner before motion hearings at the Cocke County Circuit Court.

Counsel testified that he was aware of the Petitioner's criminal history through dialogue with the Petitioner, discovery, and the State's notice of intent to seek enhanced punishment based upon the Petitioner's previous convictions. The Petitioner also advised Counsel of his drug use, including the morphine injection taken at Stuart's house the day of these events. Counsel recalled that the Petitioner told him that after taking the substance the victim alleged was morphine, the Petitioner was unable to feel the "effects." This lead the Petitioner to believe that the drugs given him were "junk or something less than morphine." Counsel said that the Petitioner also advised him of the pills the Petitioner took on the day of these events.

Counsel testified that he was aware of the Petitioner's treatment at Cherokee Mental Health. Counsel said that he did not recall the Petitioner requesting a mental evaluation, and he did not seek an evaluation because he did not find it "necessary." Counsel based this opinion on his initial conversations with the Petitioner and his correspondence with the Petitioner. Counsel described the letters between the two as follows:

> [T]hese are not the simple ramblings of somebody who is incompetent. These are well written letters, and although there may be some grammatical errors and some misspellings, [by] a man who is lucent [sic], a man who is competent, a man that knows what he's facing, and a man who knows what he needs to look at to prepare for trial.

Counsel described one letter dated February 15, 2004, in which the Petitioner listed nine different issues he wanted to discuss with Counsel regarding his defense. These issues

focused on the Petitioner's identification of refutable aspects of the evidence such as the charge alleging that the Petitioner stole the victim's items when the items were Stuart's, not the victim's. Another letter, dated April 20, 2004, requested "a copy of the motion discovery, paramedic reports, all pictures, copies or Xerox, cause of death report, autopsy, transcripts and depositions." The Petitioner asked Counsel to file a motion for expenditure of funds in order for Counsel to "try the case properly." He also inquired if there were any medical reports containing a toxicology report, and he requested a meeting with Counsel before the next court date.

Counsel testified that in another letter dated December 3, 2003, the Petitioner outlined his notes following the preliminary hearing, offering Counsel feed back, suggestions, and asking questions regarding the evidence presented at the hearing. The letter contained twenty-three or twenty-four different points, focusing on issues the Petitioner picked up while listening to the testimony at the preliminary hearing.

Counsel testified that he had been practicing law since 1992 and taken close to a hundred cases to trial. He stated that he knew how to evaluate his clients and determine whether he should request a mental evaluation. He further stated that he does not waste the "Court's time asking for evaluations that are not necessary." Counsel said that the facts of the case also indicated that the Petitioner was competent to stand trial. He stated:

> When you can recognize that you've done something wrong when you're drinking alcohol, popping pills and the car has a wreck before they even get to Mr. St[u]art's house and he and [the victim] both get out of the vehicle and go hide in the bushes because they're afraid [ ] the cops are going to come by, that is a recognition that you know right from wrong and you don't want to be caught in a car when you're screwed up on pills and alcohol.

Counsel said that he had filed motions requesting mental evaluations for clients in other cases and reiterated that he does so "when [he] believe[d] there's an issue to be filed."

On cross-examination, Counsel testified that he did not recall the Petitioner requesting a mental evaluation, but he did remember two occasions where a client insisted on a mental evaluation when Counsel did not think it necessary. Counsel said that he filed the motion anyway and was granted the evaluations. Both of the evaluations, however, indicated that the clients were competent. Counsel said that he believed that, if the Petitioner had asked him to file a motion seeking a mental evaluation, he would have filed such a motion. Counsel testified that he had nine letters from the Petitioner in his file and none of them requested or even mentioned a mental evaluation.

After hearing the evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief, finding that the Petitioner had failed to establish that Counsel was ineffective in his representation. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that he received the ineffective assistance of counsel warranting post-conviction relief. Specifically, he claims that Counsel was ineffective for failing to request a pre-trial mental evaluation of the Petitioner. He asserts that the evaluation could have been used to challenge his competency to stand trial, to support the theory that his intoxication negated the requisite *mens rea*, and to support the application of "mitigating factors" during sentencing.

We first note that the Petitioner, in his brief, initially lists his arguments, which consist of Counsel's failure to obtain a mental evaluation, in the table of contents. On the page titled, "Questions Presented for Review," Counsel's failure to obtain a mental evaluation is listed but, in addition, Counsel's failure to adequately meet with the Petitioner is listed. The issue of Counsel's failure to adequately meet with the Petitioner is no where else addressed in his brief, therefore, we conclude that this issue is waived. *See* Tenn. Ct. Crim. App. R. 10 (b).

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following

two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference

to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In denying the Petitioner post-conviction relief, the post-conviction court stated to the Petitioner:

> [T]he Court cannot find that you have carried the burden of proof that is placed upon you. We're looking at whether or not it has been shown that you had ineffective counsel. You had effective counsel, Mr. Carter. I remember the trial of this case. It was well tried. There's been evidence presented here today that there has been adequate preparation taken in getting this case ready for trial. I don't think that it takes [Counsel] as long to prepare a case for trial because of his vast experience. And it's true, he has tried more cases probably than just about anyone in this courtroom, maybe with the exception of Clyde Dunn and myself, and he's very experienced. He has shown the correspondence back and forth. Of course, I did make some mention, it's not in the record, but he was reading from notes that he had, detailed notes. At no time is there anything to indicate that he should have been put on notice that a mental evaluation was necessary.

In its written order, the post-conviction court specifically found that the Petitioner's case was "well tried and that the very experienced trial counsel was effective."

The evidence in this case does not preponderate against the post-conviction court's findings. We find unpersuasive the Petitioner's claim that Counsel was ineffective for failing to have the Petitioner undergo a mental evaluation. The applicable test as to competency to stand trial is whether the accused has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings against him. *State v. Benton*, 759 S.W.2d 427 (Tenn. Crim. App. 1988). Counsel, an experienced trial attorney, communicated regularly and thoroughly with the Petitioner both in person and through correspondence. The Petitioner actively participated in his defense by asking questions and offering up suggestions for how to

address various pieces of evidence against him. Counsel, who the post-conviction court clearly credited, testified to this and, additionally, the letters between Counsel and the Petitioner support these findings. Counsel had experience evaluating the mental competency of criminal clients and had made motions requesting mental evaluations in the past. Based upon his interactions with the Petitioner, he did not believe a mental evaluation necessary. Counsel did not file a motion for a mental evaluation because the Petitioner could aid in his defense and understood the nature of the charges. Nothing in the record indicates that the Petitioner was unable to meaningfully consult with Counsel.

The Petitioner also argues that a mental evaluation would have supported an intoxication defense at trial. Specifically, he claims that Counsel failed to present expert testimony concerning his intoxication at the time of the incident. The Petitioner, however, failed to demonstrate that Counsel was deficient as to this issue. Evidence of voluntary intoxication is admissible if it is relevant to negate a culpable mental state. T.C.A. § 39-11-503 (2010). Thus, expert testimony bearing on a defendant's intoxication can be properly admitted at trial. *State v. Vaughn*, 279 S.W.3d 584, 602 (Tenn. Crim. App. 2008). To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* The Petitioner failed to present an expert witness at the post-conviction hearing to testify regarding his voluntary intoxication at the time of these events. Moreover, at the post-conviction hearing Counsel was never specifically asked about his decision to pursue voluntary intoxication as a means to negate the *mens rea* requirement in this case. Based upon the record, there is no way for this Court to deduce what an expert witness might have testified to regarding the Petitioner's intoxication. Further, this Court cannot evaluate whether the absence of such testimony was deficient performance on Counsel's part or an informed strategic decision. Therefore, the Petitioner has not met his burden of showing that Counsel was deficient in this respect.

Finally, the Petitioner asserts that a mental evaluation could have been used "to present as mitigating factors." The Petitioner does not provide this Court with the testimony that would have been used at a sentencing hearing, he does not identify which mitigating factors would have been applicable and Counsel was never questioned on this issue during the post-conviction hearing. Furthermore, a transcript of the sentencing hearing is not included in the record preventing this Court from ascertaining what evidence was presented in the sentencing phase. Therefore, the Petitioner has failed to carry his burden as to this issue.

Accordingly, the evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed to show by clear and convincing evidence that Counsel was deficient. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE